# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

NICHOLAS JAMAL-LEEVEL THOMAS,

        Defendant-Appellant.

UNPUBLISHED
November 22, 2016

No. 326956
Kent Circuit Court
LC No. 14-007872-FH

Before: SERVITTO, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of assault with intent to do great bodily harm less than murder, carrying a concealed weapon without a license (CCW), being a felon in possession of a firearm, and possession of a firearm during the commission of a felony (felony-firearm), in connection with the shooting of Tony Floyd. Defendant admitted possession of the weapon and shooting Floyd, but claimed he acted in self-defense. The most compelling of his appellate claims arise from the admission of a 10-second video clip of his altercation with Floyd. We find no error in the admission of this fleeting glimpse of the fight, and therefore affirm.

## I. BACKGROUND

At approximately 3:30 p.m. on July 9, 2014, defendant and Floyd engaged in a fistfight at the intersection of Dallas and Alexander in Grand Rapids. Floyd claimed that he had summoned defendant and Chris Shackleford to the area because he wanted to fight them both. Defendant testified that he received no such invitation and was taken unawares when Floyd accosted him and Shackleford as they drove through the area.

Regardless of the fight's origin, defendant possessed a gun during the altercation. Defendant described that Shackleford wanted to head toward the intersection of Dallas and Fisk and defendant agreed to drive him. When they reached Dallas and Alexander, their route was blocked by a mass of people and a car parked in the middle of the street. The crowd converged on the vehicle and Shackleford took out a gun, threatening to shoot. Defendant asserted that he took the gun from Shackleford to prevent him from shooting anybody. Defendant then put the weapon in his pocket. He still carried the gun in his pocket when he exited the vehicle and fought Floyd. The fight lasted between two and two-and-a-half minutes.

-1-

At trial, Floyd persistently expressed uncertainty as to who shot him. Defendant admitted that he was the shooter, but claimed that he only intended to shoot Floyd in the leg. (The bullet actually struck Floyd's abdomen.) Defendant explained that he felt threatened because he saw someone in the crowd—"Schmoit"[1]—pull out a gun. Defendant attempted to end the fight by shooting Floyd in the leg before someone was seriously injured. Supporting defendant's version of evidence, an investigating officer spoke to an unidentified witness to the fight who reported seeing an onlooker with a gun. The lead investigating officer further noted that if armed Bemis Boys gang members were amongst the onlookers, it would be consistent with their practice to shoot at defendant after defendant shot Floyd, who admitted to gang membership.

The prosecution's evidence included a 10-second video clip recorded at the end of defendant and Floyd's fight. In the video, one can see a woman recording the fight while holding a cell phone in a bright pink case. No crowd members holding weapons are visible. The video shows the combatants tugging and tearing at each other's shirts. They then step apart and defendant, who is stooped over, pulls the gun from his pocket. There is a slight disconnect between the sound and the video, but a single gunshot is heard as well. The video ends with Floyd falling to the ground.

At the close of the evidence, the jury acquitted defendant of assault with intent to murder, but otherwise convicted defendant as charged. Defendant now appeals.

## II. VIDEO EVIDENCE

Defendant raises several challenges to the admission of the video evidence. He contends that the evidence should have been excluded because it was not properly authenticated, was more prejudicial than probative, and was incomplete. We review a criminal defendant's challenge to the admission of evidence for an abuse of discretion. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010).

The trial testimony suggested that several people in the crowd recorded the fight. Defendant claimed that he saw a two-minute video of the fight on Facebook, possibly on the page of Brittany Adams or Brittany Marshall, although he did not preserve the video for later use. Defendant claimed that the end of the Facebook video depicted him running toward his car with "two guys in the middle of the street with guns." Defendant recognized the men as Chris Kilgore and "Schmoit."

The victim's mother, Robin Floyd, testified that a strange man approached her in the hospital parking lot on the night of the fight. The man showed her a two-minute video of the fight on his cell phone. The video ended when Floyd was shot. Robin claimed to overhear a girl named "Rainbow" tell a third party that she possessed a video of the fight. Rainbow forwarded a copy of the video upon request. The video was only 10 seconds in length when received, and Robin denied editing or cropping it. She forwarded the video to the lead investigating officer,

---

[1] Floyd identified "Schmoit" as Brandon Brown.

Detective Erika Fannon. Detective Fannon denied altering the video in any fashion. The prosecution presented this video into evidence in its entirety, without editing or cropping it.

Defendant connected the name "Rainbow" with Brittany Adams, one of the possible sources of the Facebook video. The prosecution presented Adams as a witness. Adams claimed that she did not arrive on the scene until after the fight, when she found Floyd lying in the street and took him to the hospital. No one asked her if her nickname was "Rainbow." But she did deny taking or sharing any video of the fight. Adams testified that she visited Floyd at the hospital and encountered his cousin, Brittany Marshall, the other possible source of the Facebook video identified by defendant. The prosecution did not present Marshall as a witness, nor was she identified on any witness list.

## A. AUTHENTICATION

Defendant first contends that the trial court abused its discretion by admitting the video without requiring authentication. Whether evidence has been properly authenticated for admission is governed by MRE 901. Under this evidentiary rule, authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). This evidence can come from a witness with knowledge, MRE 901(b)(1), or can be ascertained from "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," MRE 901(b)(4).

Floyd's testimony properly authenticated the video. Floyd testified that he fought defendant, and the prosecution elicited testimony from Floyd that the video recording accurately portrayed the people involved in the fight. Defendant also referred to the video several times during his testimony as an actual recording of the events in question. This testimony by the victim, who was a witness with knowledge of what happened during the fight, was sufficient to support that the proffered video was a video of the subject fight. MRE 901(b)(1). And defendant's own testimony effectively waived any challenge in this regard.

## B. RULE OF COMPLETENESS

Defendant further contends that the trial court abused its discretion by admitting the video in contravention of the "rule of completeness." The rule of completeness is memorialized in MRE 106:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The rule is "designed to prevent unfairness which may result if a statement is taken out of context." *Moody v Pulte Homes, Inc*, 125 Mich App 739, 747; 337 NW2d 283 (1983), rev'd in part on other grounds 423 Mich 150 (1985). "The premise of the rule is that a thought or act cannot be accurately understood without considering the entire context and content in which the thought was expressed." *People v McReavy*, 436 Mich 197, 214; 462 NW2d 1 (1990). Under the common law, the opponent had to wait his or her turn to bring in the remainder of the statement, leaving a temporal gap between pieces of the statement, resulting in possible jury

confusion. 1 McCormick, Evidence (7th ed), § 56, p 392. Modern court rules codifying the principle "guard against the danger of an ineradicable, false first impression" by permitting the opponent to insist on admission of the entire statement at one time. *Id.* at 392-393.

Defendant's argument that the rule of completeness demanded exclusion of the video is flawed. The rule operates to allow admission of additional excerpts from a recording or writing when requested by the defendant. The rule is not used to exclude portions of a recording or writing when additional excerpts are unavailable. See *People v McGuffey*, 251 Mich App 155, 161; 649 NW2d 801 (2002) (holding that MRE 106 is "only . . . pertinent if defendant sought, but was denied, permission to have a complete writing or recorded statement introduced," and that the rule has no "bearing on the admissibility of the testimony that the prosecution introduced, except that it might have allowed defendant to supplement the prosecution's proofs").

Here, the 10-second video clip depicting a brief moment of physical battle followed by the shooting may very well have placed the shooting out of context. However, the rule of completeness codified in MRE 106 does not require its exclusion.

In this regard we find instructive the Arizona Supreme Court's opinion in *State v Steinle*, 239 Ariz 415; 372 P3d 939 (2016). Similar to this case, a crowd member used his cell phone to record a fight between the defendant and the victim, a fight which culminated in a stabbing. *Id.*, slip op at 2. Hector Ponce recorded approximately five minutes of footage. He cropped the video so that only the last 30 seconds remained and forwarded the edited version to his friend Bassam Mahfouz. Ponce then deleted the video from his device. Accordingly, the full footage was no longer available to anyone. The police learned of the video and seized Mahfouz's phone. The prosecution then presented the 30-second video clip into evidence at trial. *Id.*

Upon defendant's motion, the trial court excluded the video. The prosecution objected, noting that no state actor was "responsible for the absence of the complete video." *Id.* In a split opinion, the Arizona Court of Appeals affirmed. *Id.* The majority "reasoned that the deleted portion of the video is necessary to qualify, explain or place into context the portion already introduced." *Id.*, slip op at 4, quoting *State v Steinle*, 237 Ariz 531, 534; 354 P3d 408 (2015) (quotation marks and citations omitted). In reversing this ruling, the Arizona Supreme Court noted, "Rule 106 . . . is a rule of inclusion rather than exclusion." *Id.* The rule is used to introduce omitted sections of a recording or writing to ensure the factfinder "understand[s] . . . the total tenor and effect of the utterance." *Id.* (quotation marks and citations omitted). However, the rule provided no relief under the circumstances presented, the same circumstances presented in this case: "Rule 106 does not by its terms address situations when all that remains is a fragment of a once longer statement (for example, if only a few pages have survived an author's unsuccessful attempt to completely destroy a diary); nor does it direct the exclusion of evidence in any circumstances." *Id.*, slip op at 5.

As dictated by *McGuffey* and guided by *Steinle*, we find no basis to rely on MRE 106 to demand exclusion of the proffered video.

## C. PREJUDICIAL EFFECT

Defendant further challenges the admission of the video evidence on the ground that its probative value was substantially outweighed by the danger of unfair prejudice. Defendant did not raise this objection in the lower court and our review is therefore limited to plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

Evidence is generally admissible at trial if it is relevant, i.e., has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." MRE 401; MRE 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995) (emphasis in original), mod 450 Mich 1212 (1995). Unfair prejudice is found where " 'a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect . . . .' " *Id.* at 75-76 (quotation marks and citation omitted).

According to defendant, the trial court plainly erred by admitting the video into evidence because it was unfairly prejudicial and created a false, misleading impression of the confrontation. The Arizona Supreme Court also addressed this issue in *Steinle*, 239 Ariz, slip op at 6. The Arizona Supreme Court chastised the court of appeals for reaching this issue when the defendant had not raised it in the trial court and made only cursory arguments on appeal. *Id.*, slip op at 6-7. However, the court noted, such video clips do have the potential to "be unfairly prejudicial or misleading." *Id.*, slip op at 7. In this regard, the court recited:

> See, e.g., 2 McCormick on Evidence § 216 (7th ed) ("[C]ameras do not record everything, and do record only from the perspective of where they are situated. Enhancing and editing add a human element of subjectivity which should also be examined and understood by the jury."); see also *Snead v American Export-Isbrandtsen Lines, Inc*, 59 FRD 148, 150 (ED Pa, 1973) (Noting that "[t]he editing and splicing of films may change the chronology of events. . . . Thus, that which purports to be a means to reach the truth may be distorted, misleading, and false."). [*Id.*]

*Steinle* continued that the prejudicial effect of such evidence "might be mitigated by testimony that explains the circumstances in which the video was made or by cautionary instructions." *Id.* In *Steinle*, the trial had yet to occur and Ponce could be presented as a witness to describe his editing of the video and other events he witnessed but that were not depicted. *Id.*

Unlike in *Steinle*, the trial in this case has already taken place. The prosecution located no one who may have possessed, either currently or in the past, the entire two-minute video recording of the fight between defendant and Floyd. The prosecution apparently did not investigate the source of the video. Accordingly, the prosecution never determined whether the

video had been cropped. And the prosecution did not present the recorder as a witness to describe events underlying the video.

Ultimately, unlike in *Steinle*, we *are* left with the arduous task of determining whether the video clip was unduly prejudicial.

The issue for the jury was not whether defendant shot Floyd; defendant admitted he was the shooter and the video confirms that fact. The issue was whether defendant acted in self-defense. This defense hinged on whether members of the crowd threatened defendant with guns. Defendant testified that he noticed Schmoit with a gun during the fight. He also testified that the uncropped video he watched on Facebook showed Kilgore and Schmoit standing in the street brandishing weapons. The manner in which the fight began also plays a role. Defendant asserted he was taken completely off guard and that Floyd began punching him while he sat in his vehicle. Floyd claimed he called defendant out for the battle and defendant came to the intersection ready for a fight.

In this regard, the prosecution presented testimony from two men who live near the subject intersection. Norvell Ford witnessed the incident from his enclosed front porch. He observed defendant and Floyd exchange words before their fists flew, consistent with Floyd's version of events. Ford described that the crowd members stood with their backs to him and he saw no one with a gun. Following the gunshot, the crowd members "scatter[ed]." However, Ford did not see who shot whom, and he did not corroborate defendant's testimony that two men stood in the roadway holding guns as defendant fled to his vehicle. Lyndon Brooks testified that he came onto his porch upon hearing the fight outside. Brooks was unable to shed any light on events given the brief portion of the fight he watched and his vantage point.

Floyd testified that he scheduled the fight because defendant "was talkin' crap about me," and therefore defendant could not have been surprised when he arrived. Floyd insisted none of his acquaintances in the crowd were armed. Robin noted that in her review of the full fight video presented by the unidentified man in the hospital parking lot, the crowd appeared blurry such that no weapons would have been observable.

Based on this record, we cannot conclude that that the 10-second video was so prejudicial as to substantially outweigh its probity. A video actually showing a defendant committing the charged offense is obviously highly probative. Ford, a disinterested third-party witness, testified that the fight began as described by Floyd, not defendant. This lessens the probability that the video would have depicted Floyd punching defendant in his vehicle and pulling him out to fight. Moreover, neither Ford nor Brooks observed anyone in the crowd with a weapon. No weapons are visible in the crowd in the 10-second video, and Robin claimed that no weapons were observable in the longer video she watched. Accordingly, absolutely no evidence corroborates defendant's claim. Defendant claims that a more complete video would have revealed the presence of a weapon in Schmoit's hand. Every other witness disagreed. The jury resolved this credibility contest in the prosecution's favor. To deem the 10-second video overly prejudicial, we would have to ignore the abundant eyewitness testimony and set aside the jury's assessment of the witnesses' credibility. This we may not do. See *People v Young*, 472 Mich 130, 143; 693 NW2d 801 (2005) ("Fundamentally, it is the province of the jury to assess the credibility of

-6-

witnesses.")[2]   Furthermore, we conclude that the admission of the 10-second video was not decisive of the outcome of defendant's trial.  *Carines*, 460 Mich at 763.

## D. ASSISTANCE OF COUNSEL

In an in pro per brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, defendant challenges counsel's pretrial investigation of the case.  Such investigation would have led to information that Floyd "did in fact try to kill him" and that Floyd's "fellow gang members attempted to shoot this Defendant."  Defendant does not elaborate on the evidence that could have been uncovered.  However, we assume defendant is arguing that counsel should have found live witnesses to the fight or worked to uncover the two-minute video recording.

"The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome."  *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004).  "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Wiggins v Smith*, 539 US 510, 527; 123 S Ct 2527; 156 L Ed 2d 471 (2003).  As stated in *Strickland v Washington*, 466 US 668, 690-691; 104 S Ct 2052; 80 L Ed 2d 674 (1984):

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

In order to overcome the presumption of sound trial strategy, the defendant must show that trial counsel's failure to prepare for trial resulted in counsel's ignorance of valuable evidence that would have substantially benefited the accused.  *People v Bass*, 223 Mich App 241, 252; 581 NW2d 1 (1997), citing *People v Caballero*, 184 Mich App 636, 640, 642; 459 NW2d 80 (1990).

We first note that pretrial investigations may have been stymied by a change in guard.  On July 31, one day after defendant's arrest, the court appointed the Kent County Defender's Office to serve as defense counsel.  On August 12, the court appointed replacement counsel—Stacy L. Van Dyken.  Attorney Van Dyken immediately entered a not guilty plea on behalf of

---

[2] Defendant also claims his trial counsel was ineffective for failing to challenge the admission of the evidence on MRE 403 grounds.  Although our review certainly would have been easier with the benefit of trial court analysis, our resolution of this issue reveals that counsel's objection likely would have been futile on the current record.  As such, counsel cannot be deemed constitutionally ineffective in this regard.  See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

her client and sought discovery. She appeared at a September 22, 2014 status conference as well. On October 30, Van Dyken entered a stipulation and order for Jeffrey P. Kirchhoff to replace her as defendant's court-appointed attorney. It appears that Van Dyken and Kirchhoff shared office space but were not affiliated as law partners. Defendant suggests that the trial court should have adjourned his trial to allow Kirchhoff more time to prepare. According to the lower court register of actions, however, the court did adjourn the trial twice in November 2014, and no defense motion to adjourn was filed.

Secondly, defendant never filed a motion for a new trial or for an evidentiary hearing to consider the performance of his attorneys. See *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). "When the trial court has not conducted a hearing to determine whether a defendant's counsel was ineffective, our review is limited to mistakes apparent from the record." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). When the defendant's challenge is to counsel's pretrial preparation, the existing record will rarely be adequate to support the claim.

Here, we learned the names of several additional witnesses that the prosecution and defense counsel should have at least interviewed in preparing for trial. These witnesses included Brandon Brown (Schmoit), Chris Kilgore, and Brittany Marshall. Counsel for both sides also should have met with Chris Shackleford, who arrived at the scene with defendant. The parties also should have attempted to identify those individuals shown in the crowd during the video clip. This would include the woman holding the phone in a bright pink case, who recorded the fight from a different vantage point. Counsel also should have reviewed Brittany Adams's and Brittany Marshall's Facebook pages to ascertain whether either maintained a longer recording of the fight on their pages. If not, counsel could have researched whether videos removed by account holders can be recovered. The presence of these witnesses and additional video footage could have changed the outcome on whether the video was overly prejudicial. Such evidence could have supported defendant's version of events.

Yet on this record, we cannot declare that defense counsel did not take these actions. It is possible that counsel actually met with these individuals and learned that they would provide damaging testimony or that none possessed additional video evidence. The witnesses may have refused to speak to defense counsel. Facebook research may have led to a dead end. It is equally possible that defense counsel sat back and made no investigation. However, we can make no assumptions and therefore cannot adjudge counsel ineffective. Accordingly, we are bound to reject defendant's ineffective assistance claim.

III. JURY INSTRUCTION

At the close of trial, the court read the jury a self-defense instruction in relation to his assault charges, as well as the CCW and felony-firearm charges. The court did not, however, read a self-defense instruction in connection with his felon-in-possession charge. Defendant now asserts that such an instruction should have been given.

In relation to jury instruction requests, we review for an abuse of discretion the trial court's determination whether an instruction is applicable and de novo underlying issues of law. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006). "The defendant bears the burden of establishing that the asserted instructional error resulted in a miscarriage of justice." *People v*

-8-

*Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). Criminal defendants are "entitled to have a properly instructed jury consider the evidence against" them. *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). To fulfill this entitlement, a court must give a requested "jury instruction on a theory or defense" if it is supported by the evidence. *Id.*

As a general rule, a defendant may raise self-defense in response to a felon-in-possession charge, as long as the defense is supported by the evidence. *Dupree*, 486 Mich at 712. Under the common law, self-defense was available " 'if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself.' " *Id.* at 707, quoting *Riddle*, 467 Mich at 127. The Legislature enacted the Self-Defense Act (SDA) in 2006 and "codified the circumstances in which a person may use deadly force in self-defense or in defense of another person . . . ." *Dupree*, 486 Mich at 708; see MCL 780.972. Self-defense remains a viable defense to a felon-in-possession charge under the SDA if "the accused had an honest and reasonable belief that the use of deadly force was necessary to prevent imminent death, great bodily harm, or sexual assault to himself or herself or to another." *People v Guajardo*, 300 Mich App 26, 40; 832 NW2d 409 (2013).

In this case, defendant testified that he took the gun from Shackleford to prevent him from shooting someone. Arguably, defendant took possession of the gun despite his felon status to prevent imminent harm to another. However, even if the provision of this instruction was justified, its omission was harmless. As noted, the court read the self-defense instruction in relation to the other charged offenses. Despite the self-defense instruction, the jury convicted defendant of CCW and felony-firearm. The jury did acquit defendant of assault with intent to murder and convicted him of the lesser included offense of assault with intent to do great bodily harm. The self-defense instruction may have played a role in that verdict, or the jury could have accepted defendant's testimony that he only intended to shoot Floyd in the leg. As the jury rejected defendant's self-defense theory in relation to the other weapons offenses, there is no reason to believe it would have accepted the defense against his felon-in-possession charge. Accordingly, we discern no error warranting relief.

## IV. STANDARD 4 BRIEF

Defendant raises several additional challenges to his convictions in his Standard 4 brief. None of these claims possess any merit.

## A. JUDICIAL THREAT

Defendant first contends that the trial judge threatened at the September 22, 2014 status conference to impose a 36-year sentence if defendant rejected the prosecution's plea offer and insisted on proceeding to trial. The transcript of the conference completely belies defendant's claim. In conjunction with making the plea offer part of the record, the prosecution advised defendant that if he was convicted as charged, the preliminary scoring of his guidelines variables led to a minimum sentencing range as high as 37½ years. The court informed defendant, "All right. Sir, it doesn't make any difference to me whether you go to trial in this matter, or whether you enter a plea. Do you understand that, sir?" Defendant answered in the affirmative. The court then inquired whether defendant understood "what the Prosecutor is saying basically

they're offering you a 25-year minimum, and if you take that and enter pleas to those various counts, then you will not be putting yourself at risk for an additional 12½ years." Defendant again answered in the affirmative.

## B. PRESENCE AT CRITICAL STAGES

Defendant next asserts that the court, the prosecutor, and his own counsel violated his constitutional right to be present at every critical stage in the proceedings. Specifically, defendant notes his absence at a December 19, 2014 status conference. It appears from the lower court register of actions, however, that the status conference was adjourned and not conducted that day. Accordingly, defendant did not have a constitutional right to be present that could have been violated.

## C. DENIAL OF ADJOURNMENT

Related to an earlier argument, defendant claims that attorney Kirchhoff "went into court" on January 21, 2015, and "asked for an adjournment" based on the brevity of his appointment, but the court "refused." If such a request was made off the record, counsel should have renewed his motion, or mentioned the earlier request, once the proceedings began in the presence of the court reporter. As it stands, there is no record of any such request being made. Accordingly, we can discern no error on either counsel's or the court's part.

## D. ASSISTANCE OF COUNSEL

Defendant also raises additional challenges to counsel's performance at trial. Defendant contends that defense counsel should have sought funds to secure a defense investigator and expert witnesses in videography and firearms and a medical expert. He asserts that counsel should have filed a motion regarding the delay in arraignment and to force the prosecution to file a res gestae witness list or "to STOP the Trial, toobtain [sic] very important information, documents and other things." Defendant alleges that he "begged [counsel] to at least file for an Evidentiary hearing."

> " '[T]he right to counsel is the right to the effective assistance of counsel.' " *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984), quoting *McMann v Richardson*, 397 US 759, 771 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970). An ineffective assistance claim includes two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish the deficiency component, a defendant must show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). With respect to the prejudice aspect, the defendant must demonstrate a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *Id.* at 663-664. The defendant also must overcome the strong presumptions that "counsel's conduct [fell] within the wide range of reasonable professional assistance" and

that counsel's actions were sound trial strategy. *Strickland*, 466 US at 689. [*People v Galloway*, 307 Mich App 151, 157-158; 858 NW2d 520 (2014), rev'd in part on other grounds 498 Mich 902; 870 NW2d 893 (2015).]

In relation to the presentation of expert witnesses, defendant argues that such witnesses could have explained from the evidence that defendant intended to shoot Floyd in the leg, but that the bullet hit his abdomen because Floyd moved. This would have supported defendant's theory that he only shot to frighten and disburse the crowd so armed men in the vicinity could not take action against him. "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). Defendant has not identified any potential expert witness, nor has he established by affidavit or report that any expert could have testified in the manner he advocates. He therefore has failed in his burden of establishing the factual predicate for his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

A defense investigator certainly may have helped in locating crowd members who witnessed the fight or tracking down a longer recording of the fight. However, despite being able to identify some of the individuals present or possessing fight footage, defendant has taken no action to at least present witness affidavits to support that these witnesses would have been helpful.

Defendant does not appreciate that the only relief available from any delay in his arraignment would be the exclusion of evidence improperly obtained as a direct result of a purposeful delay. See *People v Cain*, 229 Mich App 27, 49-50; 829 NW2d 37 (2012), vacated in part on other grounds 495 Mich 874 (2013). Defendant cites no evidence that could have been excluded had counsel raised such a motion.

Defendant also failed to notice upon review of the record that the prosecution did file a witness list before trial. Accordingly, defense counsel had no ground to file a motion to compel.

Defendant identifies no other documents or evidence that defense counsel should have sought production of or the purpose of his proposed evidentiary hearing. He also claims that counsel failed to understand various laws that would have assisted defendant's case, but does not elaborate with examples. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation to supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Accordingly, we deem these challenges abandoned.

In addition, defendant claims that defense counsel failed to adequately prepare him to testify at trial, negatively impacting his theory of self-defense. Absent any record regarding counsel's pretrial interactions with defendant, we have no basis to judge counsel's performance. This claim therefore must fail.

Defendant challenges counsel's "investigat[ion]" of the presentence investigation report's section on defendant's history. He contends that this section inadequately describes "the 33 years of defendant's life, his struggles with physical over weight problems, or his achievements

in colleges he attended, or that the defendant had accomplished a lot of things." There is no support for requiring counsel to investigate any further than consulting with his client regarding the accuracy of the PSIR's information. Moreover, defendant has not indicated how the PSIR should have been revised. Accordingly, defendant cannot demonstrate that he is entitled to relief.[3]

## E. PROSECUTORIAL MISCONDUCT

Finally, defendant contends that the prosecutor improperly implied specialized knowledge of defendant's guilt and placing himself on equal ground as the jury. In this regard, the prosecutor often used the terms "we" and "us" to treat the jury and prosecution as a unit. Defendant also challenges counsel's performance in failing to object.

We review this unpreserved claim for plain error. *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). Our review is conducted "on a case-by-case basis," "consider[ing] the prosecutor's remarks in context." *People v Bennett*, 290 Mich App 465, 476; 802 NW2d 627 (2010). A prosecutor "is free to argue the evidence and all reasonable inferences arising from it." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). Although prosecutors are generally afforded "great latitude regarding their arguments and conduct during closing argument," *People v Bosca*, 310 Mich App 1, 14; 871 NW2d 307 (2015) (quotation marks and citation omitted), prosecutors may not "express their personal opinion of a defendant's guilt." *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995) (citations omitted). A prosecutor also may not use the prestige of the prosecutor's office to inject a personal opinion regarding the strength of his case. *Id.* at 286.

As examples of his challenged comments, defendant quotes the prosecutor as stating, "that's a pretty easy count for us to conclude that the defendant is guilty of" and "we know the defendant intended to kill [the victim] because at the time he pulled the gun out of the pocket, it didn't not—it's—it's completely loaded, it's completely cocked." The prosecutor "is not required to state inferences and conclusions in the blandest possible terms." *People v Unger*, 278 Mich App 210, 239; 749 NW2d 272 (2008). "Where the prosecutor's argument is based upon the evidence and does not suggest that the jury decide the case on the authority of the prosecutor's office, the words 'I believe' or 'I want you to convict' are not improper." *People v Swartz*, 171 Mich App 364, 371; 429 NW2d 905 (1988). The "crucial inquiry" is not whether the prosecutor used personal words, such as "I" or "we," but whether the prosecutor was attempting to vouch for the defendant's guilt. *People v Reed*, 449 Mich 375, 399; 535 NW2d 496 (1995) (BOYLE, J.).

In this case, the challenged statements do not represent a personal plea by the prosecutor that the jury find defendant guilty or a personal opinion by the prosecutor that defendant was guilty. The comments followed statements discussing the evidence and how the evidence

---

[3] Defendant urges that the cumulative effect of counsel's errors demands relief. Absent any discernable errors on counsel's part, this claim must fail. *People v LeBlanc*, 465 Mich 575, 592; 640 NW2d 246 (2002).

supported the elements of the charged crimes. They are devoid of any suggestion by the prosecutor that he had any special knowledge regarding the case from which he could vouch for the evidence at trial. Instead, the prosecutor simply made arguments, based on the evidence presented at trial, that the elements of each of the crimes charged was met. Thus, even though the prosecutor used the words "us" and "we" while arguing that the evidence supported that defendant was guilty of the charged crimes, the prosecutor's challenged statements were not improper and did not prejudice defendant. As the comments were not improper, defense counsel had no ground to object.

We affirm.

/s/ Deborah A. Servitto
/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher